IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MILDRED LEMUEL, as administratrix<br>of the estate of Darnell Eugene Lemuel,<br>deceased, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br><br><br>ADMIRAL INS. CO.,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 2:03cv1101-D<br>)            (LEAD CASE)<br>)  (consolidated with civil action<br>)   numbers 2:03cv1102-D and<br>)   2:04cv942-D)<br>)         (WO)<br>)<br>) |

MEMORANDUM OPINION AND ORDER

I. INTRODUCTION

Before the court are three motions for summary judgment, each of which is

accompanied by a memorandum brief and an evidentiary submission: (1) Admiral

Insurance Co.'s ("Admiral") motion for summary judgment (Doc. No. 26); (2) Mildred

Lemuel's ("Lemuel") counter-motion for summary judgment (Doc. No. 46); and

(3) Markel American Insurance Company's ("Markel") motion for summary judgment.[1]

(Doc. Nos. 75-76.)

These consolidated proceedings, involving three separate lawsuits, arose from a

$5,000,000 default judgment entered in favor of Lemuel in the Alabama state court on her

---

[1] Replies, surreplies and various other supplemental pleadings and evidentiary
submissions have been filed and considered by the court. (See Doc. Nos. 48, 56, 58, 90,
101, 103-05, 110.) For brevity, when citing to pleadings in the record, the court will refer
to the docket numbers assigned to those pleadings ("Doc. No.").

wrongful death complaint seeking recovery against Lifestar Response of Alabama, Inc., d/b/a Care Ambulance ("Lifestar"), also a party in this litigation.  In the underlying state court lawsuit, Lemuel alleged that an ambulance service operated by Lifestar provided inadequate medical treatment to Lemuel's husband, which led to his untimely death.  At all relevant times, Lifestar's primary insurance carrier was Admiral, and its excess insurance carrier was Markel.

Lemuel, thereafter, filed a garnishment action in state court, claiming that Admiral was liable for a portion of the $5,000,000 default judgment against Lifestar pursuant to the insurance policy.  Admiral responded by simultaneously removing the garnishment suit to the United States District Court for the Middle District of Alabama, see 2:03cv1101-D, and filing a declaratory judgment action in this court, seeking a declaration that it is not liable for the default judgment, see 2:03cv1102-D.

In its declaratory judgment action, Admiral argues that summary judgment is appropriate because, contrary to the terms of the insurance policy, Lifestar did not notify it of Lemuel's lawsuit or forward suit papers, until after the entry of the default judgment. Because of the delay in notice, Admiral asserts that it is not required to pay any portion of the default judgment rendered against Lifestar.  In a separate declaratory judgment action (2:04cv042-D), Markel, who did not receive notice of the Lemuel lawsuit until almost a year after Admiral, is seeking a similar summary judgment adjudication that Lifestar's untimely notice constitutes a breach of the notice provision of its policy.  As a result, Markel also contends that it is not responsible or liable to expend any sums under

2

its excess policy as a result of the default judgment entered against Lifestar in the underlying state court litigation.

Opposing Admiral's and Markel's motions for summary judgment, Lemuel and Lifestar present parallel arguments.  Relying on New York statutory law or, alternatively, on common-law equitable estoppel and waiver, they assert that Admiral forfeited its defense of late notice because it failed to provide timely notice of its intent to disclaim coverage on that basis.  Additionally, Lifestar persists in the contention it advanced during the state court proceedings that, due to the wrong designation of its name, Lifestar was not put on notice of the Lemuel litigation until after the entry of the default judgment and that, after receiving actual notice, it immediately notified Admiral.  Regarding Markel's motion for summary judgment, Lemuel and Lifestar contend that New Jersey law governs the coverage dispute and argue, in effect, that the excess policy's notice provision is unenforceable against Lifestar under that state's law, but that, in any event, Markel was not prejudiced by the alleged late notice.  Lemuel's and Lifestar's arguments bring to the forefront choice-of-law issues.

For the reasons stated herein, the court finds that the state court's finding that Lifestar received actual notice of the Lemuel litigation on January 7, 2003, is entitled to preclusive effect based upon the doctrine of *res judicata* and that, under the applicable law from each jurisdiction cited by the parties, Lifestar acted unreasonably in giving late notice to Admiral and Markel.  Furthermore, the court finds that Markel, which must demonstrate that it was prejudiced as a result of the late notice, has satisfied its burden.

3

Accordingly, after careful consideration of the arguments of counsel, the relevant

law and the record as a whole, the court finds that Admiral's and Markel's motions for

summary judgment are due to be granted and that Admiral and Markel are entitled to

declarations that they are not obligated to indemnify Lifestar or pay any portion of the

$5,000,000 default judgment in the Lemuel lawsuit.  The court further finds that Lemuel's

counter-motion for summary judgment is due to be denied.


## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant

to 28 U.S.C. § 1332 (diversity jurisdiction).  The parties do not contest personal

jurisdiction or venue, and the court finds adequate allegations of both.


## III.  SUMMARY JUDGMENT STANDARD

A court considering a motion for summary judgment must construe the evidence

and make factual inferences in the light most favorable to the nonmoving party.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398

U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the

evidence and determine the truth of the matter," but solely "determine[s] whether there is

a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)

4

(citations omitted).  This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.


## IV.  BACKGROUND

### A.  The Facts Surrounding the Default Judgment as Determined by the State Court

The findings upon which the underlying default judgment is based are set forth in the circuit court's July 31, 2003 order, entered in the case styled Mildred Lemuel, et al. v. Care Ambulance Service of Alabama, Inc., et al., CV 2002-3098-PR, in the Circuit Court for Montgomery County, Alabama (Ex. 1 to Doc. No. 26), as well as in the opinion of the Supreme Court of Alabama, affirming the judgment of the circuit court, Lifestar

Response of Alabama, Inc. v. Lemuel, 908 So. 2d 207 (Ala. 2004), which the court
summarizes below.

On November 8, 2000, Lemuel's husband suffered a "hemorrhagic cardiovascular
accident." Lifestar, 908 So.2d at 210, 222.  A Lifestar ambulance and its paramedics
responded to the "911" emergency call from Lemuel.  See id. at 210, 221.  Lifestar
transported Lemuel's husband to the hospital.  His condition was grave when he arrived,
and two days later Lemuel's husband died at that facility.  See id. at 210, 221-22.

On November 7, 2002, Lemuel, as the administratrix of her husband's estate and in
her own right, filed a wrongful death complaint in the Circuit Court for Montgomery
County, Alabama.  In her state-court complaint, Lemuel alleged that the failure of Care
Ambulance Service of Alabama, Inc.'s paramedics to administer oxygen to Lemuel's
husband and to provide other necessary emergency treatment resulted in oxygen
deprivation to his brain which led to brain damage and ultimately death.[2]

Unbeknownst to her at the time, Lemuel incorrectly named Care as the defendant,
rather than Lifestar.  As in the state court litigation, the failure of Lemuel to correctly
name Lifestar in the original state court complaint is a fact which underlies the heart of
Lifestar's arguments in this litigation; thus, at this juncture, the court highlights the facts
surrounding the relationship between Care and Lifestar.  As reflected in the Supreme
Court of Alabama's opinion, Lifestar and Care entered into an "Asset Purchase
Agreement" on November 19, 1998, pursuant to which Lifestar purchased all of the assets
of Care.  Care operated a basic and advanced life-support ambulance and medical-

_____

[2] Hereafter, the court refers to "Care Ambulance Service of Alabama, Inc." as "Care."

transportation service, and its Montgomery, Alabama, South Perry Street place of business was conveyed to Lifestar as part of that Agreement.  See id. at 209.

During the state court proceedings, the circuit court found that Lifestar "caused substantial confusion to exist in the public's ability to distinguish between 'Lifestar' and 'Care.'"  (Circuit Court Order at 7 (Ex. E to Doc. No. 46).)  After Lifestar purchased the assets of "Care," Care continued to use the trade name "Care Ambulance Service," despite the parties' agreement that Care would change its name; Lifestar "share[d] a common office" with Care at the South Perry Street address in Montgomery, Alabama; and Lifestar continued to advertise itself under the Care trade name.  (Id. at 7-8.)

The summons directed service on Care at the South Perry Street address.  On January 7, 2003, service was perfected by Deputy Glenn Mannich of the Montgomery County Sheriff's Department through personal service upon Karen Robertson ("Robertson"), human resource manager for Lifestar at Lifestar's place of business on South Perry Street, Montgomery, Alabama.[3]  (Circuit Court Order, Ex. E to Doc. No. 46); Lifestar, 908 So. 2d at 210.

After Lifestar failed to file an answer or to otherwise respond to the Lemuel complaint, Lemuel filed an application for default judgment on February 20, 2003.

---

[3] As observed by the Supreme Court of Alabama, the circuit court received testimony from Deputy Mannich that "he had served 'eight or ten papers' on Care Ambulance Service at the Perry Street address during the preceding four years[,]" that "Robertson was 'one of the people that does accept the papers for the company,'" and that "she had previously signed for the papers on behalf of 'Care Ambulance Service of Alabama, Inc.'" Lifestar, 908 So. 2d at 210.

7

The circuit court scheduled a hearing on Lemuel's motion for May 28, 2003.  Notice of the hearing was sent to Lifestar at its place on business on 929 South Perry Street.  (See Circuit Court Order, Ex. E to Doc. No. 46.)  At the May 28 hearing, after receiving testimony and evidentiary exhibits, the circuit court entered a default judgment, awarding Lemuel $5,000,000 against Lifestar in punitive damages.[4]  Lifestar did not make an appearance at the hearing.  (See id.)

On June 9, 2003, believing that she had discerned the true name of the employer of the paramedics who treated her husband, Lemuel filed a motion in the circuit court to reflect that the judgment also should operate as a judgment against "Life Star Response Corp of Alabama, d/b/a Care Ambulance."  (See id. at 4 (Ex. E to Doc. No. 46).) Thereafter, on June 12, 2003, Jack B. Hinton, Jr., Esquire, filed a notice of appearance on behalf of "Care."  On June 20, 2003, Bert P. Taylor, Esquire, filed a notice of appearance on behalf of "Life Star Response of Alabama, Inc., d/b/a Care Ambulance Service."[5] Lifestar, 908 So.2d at 211.  On June 23, 2003, Lemuel moved to amend the judgment to

---

[4] As observed by the Supreme Court of Alabama, the circuit court "made the express finding 'that the conduct of Care Ambulance and its employees was gross negligence of the worst kind' and that their 'egregious conduct' warranted a punitive-damages award of $5,000,000."  Lifestar, 908 So. 2d at 222.  A witness at the circuit court hearing "characterized the care provided by the Lifestar personnel as 'more of the type of care that would have been given back in the 60's when the funeral homes ran the EMS services. They basically arrived on the scene, put you in a bag and carried you, and no care was given.'"  Id.

[5] The circuit court observed that Taylor incorrectly spelled "Lifestar" as two words. (Circuit Court Order at 4 (Ex. E to Doc. No. 46).)

substitute "Lifestar Response of Alabama, Inc., d/b/a Care Ambulance Service" for the name of the defendant.  (Circuit Court Order at 4 (Ex. E to Doc. No. 46).)  On July 18, 2003, Care and Lifestar moved to set aside the default judgment and filed an objection to Lemuel's motion to amend the default judgment.  Lifestar, 908 So. 2d at 211-12.

The circuit court convened a hearing on the foregoing motions on July 22, 2003, during which it received evidence and heard arguments.  Lifestar and Care were represented by counsel at the hearing.  (See Circuit Court Order, Ex. E to Doc. No. 46.)  Ultimately, the circuit court granted Lemuel's motion to amend the default judgment, and denied Lifestar's and Care's motions to set aside the judgment.  The circuit court's findings are memorialized in its July 31, 2003, order.  (See id.)  Therein, the circuit court rejected Lifestar's argument that the default judgment was "void" for want of personal jurisdiction, specifically improper service of process based upon the wrong identification of Lifestar in the complaint.  The circuit court found that, upon service of the summons and complaint on Robertson, Lifestar's employee, "it should have been apparent to the on-site representatives of 'Lifestar' that [Lemuel] stated a claim for damages against the entity doing business under the name 'Care Ambulance Service' based on the alleged wrongful acts of the employees of 'Lifestar.'"  (Id. at 6.)  The court continued, "It was incumbent upon 'Lifestar' to appear and answer if it believed [it] had been incorrectly named in the complaint."  (Id.)  The circuit court observed that, in a separate lawsuit filed six months prior to the commencement of Lemuel's action, Lifestar, although misnamed, filed an answer and therein indicated that it had been "incorrectly designated."  (Id. at 6-7.)

9

In sum, as grounds for refusing to set aside the default judgment, the circuit court entered the following findings, among others.  On January 7, 2003, "there can be no question that 'Lifestar' received actual notice that a claim had been filed for negligence of [its] employees.  It is the opinion of this court that 'Lifestar' took a calculated risk in not appearing to defend."  (Id. at 7; see also id. at 2.)  Lemuel "perfected service of the Summons and Complaint upon both 'Care' and 'Lifestar' sufficiently to require each company to appear and defend."  (Id. at 7.)  "'Lifestar' operated under the trade name 'Care Ambulance Service' and as such the default judgment rendered against 'Care' is a judgment against 'Lifestar.'"  (Id. at 8.)  The default judgment was the result of Lifestar's and Care's own culpable conduct; namely, both entities "knowingly and intentionally disregarded the notice they . . . received both of the Summons and Complaint and the Court's notification of the Default Hearing."  (Id. at 9.)  Additionally, they "ignored" procedural rules and "flagrantly disregard[ed]" court rules.  (Id. at 9-10.)  The circuit court concluded that the default judgment presented a "dilemma of their [Care's and Lifestar's] own making and the result of deliberate choices."  (Id. at 10.)

On September 10, 2003, Lifestar appealed.[6]  In a published opinion, the Supreme Court of Alabama affirmed the judgment of the circuit court.  See Lifestar, 908 So.2d at 207.  The Supreme Court rejected Lifestar's arguments that the default judgment against Lifestar's trade name was void for lack of proper service, see id. at 214-15, and that Lifestar did not have notice that it was being sued upon receipt of the summons and complaint on January 7, 2003.  See id. at 216-217.

Also contrary to Lifestar's position, the Supreme Court of Alabama held that the circuit court did not err in denying Lifestar's motion to set aside the default judgment. See id. at 218-24.  Relying on its precedent, the court examined three factors to reach its decision, namely whether Lifestar had a meritorious defense, whether setting aside the default judgment would result in unfair prejudice to Lemuel, and whether the default judgment was a result of Lifestar's own culpable conduct.  See id. at 218 (citing Kirtland v. Fort Morgan Auth. Sewer Serv., Inc., 524 So.2d 600 (Ala. 1988)).  As to the first two Kirtland factors, the court concluded that, during the circuit court proceedings, Lifestar failed to present any "credible factual basis" in support of its defense, see id. at 219-23,

---

[6] On appeal, Lifestar raised the following four issues:

(1) that the default judgment was void because service of process was insufficient as to both it and Care; (2) that if the judgment was not void, it should have been set aside; (3) that if the judgment was not void and not otherwise due to be set aside, it was error for Judge Price to substitute Lifestar as the judgment debtor; and (4) that the $5,000,000 default judgment was excessive.

Lifestar, 908 So.2d at 214.  Care did not appeal.  See id.

11

and that Lifestar failed to meet its burden of demonstrating the absence of prejudice to Lemuel.  See id. at 222-23.

Furthermore, as to the third Kirtland factor, the Supreme Court held that the circuit court did not abuse its discretion when it found that Lifestar engaged in culpable conduct, rejecting Lifestar's argument that Lifestar "could not reasonably have known" that it was the entity that had been sued in the Lemuel lawsuit.  See id. at 216-17, 223-25.  The Supreme Court of Alabama observed:

> Certainly it would have been apparent to Vanessa Hill[7], as well as to subsequent recipients of the complaint at Lifestar's home office, that the incident described in the complaint necessarily served to identify Lifestar as the entity intended to be sued.  As noted, only a few months before Ms. Lemuel filed her action, the summons and complaint for another wrongful-death action against "Care Ambulance Service of Alabama, Inc." had been served on Vanessa Hill, and Lifestar had answered the complaint, identifying itself as doing business as "Care Ambulance Service" and explaining that it had been "incorrectly designated in the complaint as Care Ambulance Service of Alabama, Inc."  Lifestar obviously received and processed Judge Price's May 16 order setting a hearing on damages for May 28.  That was established by the explanation in Care's motion to set aside the default judgment and the attached copy of that order bearing imprinted "fax" routing information showing that it had been faxed to Care from the Montgomery office of Lifestar on May 29, 2003.  Even if it is assumed that the May 16 order was not forwarded to Lifestar's Montgomery office until after it was filed with the circuit clerk on May 22, Lifestar has made no attempt to account for why it delayed forwarding notice of the hearing to Care until the day after the scheduled hearing.  Lifestar took no action other

---

[7] Vanessa Hill ("Hill") was the billing clerk at Lifestar's South Perry Street office where service of process was effectuated.  Robertson stated that, although she did not have an independent recollection of receiving the summons and complaint in the Lemuel lawsuit, she would not have read the legal papers, but would have given them to Hill, who, in turn, would have forwarded the documents to Lifestar's home office.  See Lifestar, 908 So.2d at 210.

> than to have one of its representatives telephone Halstrom[8] on June 3, 2003,
> to advise him that the default judgment had been taken against the wrong
> party.  When Lifestar finally filed a motion to set aside the judgment, it
> made no attempt to invoke the Kirtland factors except to argue that Care
> had a meritorious defense.

Id. at 224 (internal footnotes added).

   B.   The Admiral Policy, Lifestar's Notification and Admiral's Response

   Admiral insured Lifestar under a medical professional liability policy with

coverage limits of $1,000,000 per claim.[9]  That policy, number A02PL16373, was

effective from October 8, 2002, to October 8, 2003, and contained a $1,000,000 per claim

limit with a $40,000 deductible.  The policy was a claims-made policy, meaning that

coverage was provided for "services rendered, or alleged to have been rendered" during

the policy period or prior to the inception of the policy, provided that in the latter

scenario the insurer had no knowledge of the claim or suit when application was made for

the policy and that the claim was "made against the insured and reported to [Admiral]

during the policy period."  (Admiral Policy at 1, Ex. A to Doc. No. 46.)

   In this case, the accident which gave rise to the Lemuel lawsuit occurred prior to

the inception of the policy; Lemuel, however, filed her lawsuit in November 2002, within

the policy period, and Lifestar gave notice of the lawsuit to Admiral in June 2003, also

---

   [8] Timothy C. Halstrom, Esquire, is counsel for Lemuel.

   [9] The policy originally was issued to Bi County Ambulance; Lifestar and "Care
Ambulance of Alabama" were listed as additional insureds.  (Ex. 4 to Doc. No. 48; Ex. 4
to Doc. No. 48.)

within the policy period.  Therefore, the applicable "claims-made" provisions in this action are those pertaining to services allegedly rendered prior to the effective date of the policy, but which form the basis of a claim made and reported during the policy period.

A central issue is whether Lifestar timely reported the Lemuel claim and suit in compliance with the policy's notice conditions.  The Admiral policy provided that, as a condition precedent to coverage, the insured must give Admiral notice of any claim or lawsuit made against it "as soon as practicable."  The Admiral policy also required the insured to forward "immediately" any summons or lawsuit papers it received.  These notice requirements were set forth in Section IX of the Admiral policy and provided, in pertinent part, as follows:

> IX. CONDITIONS
> A. Notice of Claim or Suit:  The Insured shall, as a condition precedent to their right to the protection afforded by this insurance, give to the Company as soon as practicable, notice
> (1) of any claim made against them, or
> (2) of the receipt of notice from any person of an intention to hold the Insured responsible for the results of any breach of duty or of an incident or circumstance likely to give rise to a claim hereunder, and shall in any case, upon request, give the Company such information as the Company may reasonably require.
>
> In the event claim is made or suit is brought against the Insured, the Insured shall IMMEDIATELY forward to the Company every demand, notice, summons or other process received by him or by his representatives.

(Admiral Policy at 5, Ex. A to Doc. No. 46.)

There is no dispute that Admiral did not have knowledge of the Lemuel lawsuit or claim prior to the circuit court's entry of the $5,000,000 default judgment against "Care"

on May 28, 2003.  Similarly, it is unchallenged that, prior to the entry of this default judgment, Admiral never received any suit papers or other pleadings from Lifestar or from any other party.  (See Doc. No. 26 at 8, 12.)

It was not until June 3, 2003, that Lifestar first notified Admiral of the Lemuel lawsuit, via a telephone call from Bob Froelich ("Froelich"), corporate risk and safety manager for Lifestar Response Corporation, a parent company of Lifestar.[10]  Froelich followed up his telephone call with written notice of the claim in a letter dated June 16, 2003, which was received by Admiral on June 17, 2003.  (Ex. 4 to Doc. No. 26 (Notification letter); Ex. 5 to Doc. No. 26 (Scott C. Mansfield Aff.).)

In a letter dated June 19, 2003, and signed by Scott C. Mansfield ("Mansfield"), the claims administrator assigned to the claim, Admiral acknowledged receipt of the foregoing letter from Froelich.  (Ex. 2 to Doc. No. 48.)  Therein, Mansfield set forth the limits of coverage under the Admiral policy, advised Lifestar to notify any excess insurance carriers, acknowledged the retention of Bert Taylor, Esquire, to represent Lifestar, and indicated that "a number of issues are unclear with respect to the $5,000,000 default judgment entered against Care . . . in the Lemuel case."  (Id.)

Subsequently, in a letter dated July 7, 2003, mailed to Bi County Ambulance, Admiral acknowledged receipt of the claim concerning the Lemuel lawsuit.  Therein,

_____

[10] There is a discrepancy in the record as to whether Admiral received notice on June 3, 2003, or June 13, 2003.  The discrepancy is not material to resolution of the pending motions for summary judgment because the court would reach the same result regardless of which of the two dates in June Admiral received notice.

Admiral "reserve[d] all rights it has, through any investigation of this loss, to later limit/disclaim coverage under any policy provision/exclusion."  (Ex. 3 to Doc. No. 48.)

Finally, in a letter dated September 10, 2003, which was addressed to Froelich, Lifestar received notice from Admiral that it [Admiral] was "reserving its rights in the entirety with regard to this [the Lemuel] claim pending a coverage investigation" and would "not be providing or directing the defense at this time."  (Ex. 4 to Doc. No. 48.) The letter was delivered to Froelich by fax and certified mail.  Attached to the letter was a reservation of rights by Admiral in which Admiral cited the above-quoted notice provisions as one potential basis for denying coverage.  (Id.)

## C.  The Markel Policy and Lifestar's Notification

In addition to its primary insurance policy from Admiral, Lifestar also had an excess insurance policy from Markel.  In 1998, Markel issued a Commercial Umbrella Liability Policy to Robinson's Ambulance & Oxygen Service, Inc., et al., which was extended by amendment to cover losses occurring through February 28, 2001.[11]  (Markel Policy (Ex. 5 to Doc. No. 75); Endorsement 9.)  This policy, number CU-AA-1714-MEU, contained a $9,000,000 per claim limit that paid "the ultimate net loss" in excess of

---

[11] This policy is an "occurrence" policy meaning that Lifestar was insured for any loss which occurred during the policy period regardless of when the claim or suit was filed. The court also notes that there is an issue as to whether Lifestar ever was added as an additional insured.  (See Doc. No. 86, ¶ 10.)  For present purposes, the court assumes, without deciding, that Lifestar was an insured under the Markel policy.

the "retained limit." (Id. at 3.) The Policy defined the "retained limit" as the amount of "underlying insurance" applicable to a claim. (Id. at 23.) The amount of "underlying insurance" on the Markel policy was $1,000,000. (Id.) In other words, the Markel policy provided coverage for certain damages in excess of $1,000,000.[12]

Section V of the Markel policy, "Policy Conditions," provided as follows:

E.  Duties in the Event of an Occurrence, Claim, or Suit

    1.  You must see to it that we or our authorized representative and your underlying insurers:

        a.    notified as soon as possible of any "occurrence" which may result in a "claim" involving this insurance or any "underlying insurance";

        b.    receive notice of the "claim" or "suit" as soon as possible.  Notice includes:

            1)    how, when, and where the "occurrence" or alleged "offense" took place;
            2)    the insured's name and address;
            3)    the names and addresses of any injured persons

---

[12] As stated in Cincinnati Insurance Co., Inc. v. Girod,

> "Umbrella liability coverage" is coverage offered through an insurance company to its insureds to pick up where that insurance company's primary coverage ends.  The primary function of umbrella coverage is to provide additional liability security, as well as peace of mind, to an insured who hopes that he will never be involved in any substantial claim or lawsuit, but who, if he is involved in such an action, is assured that if damages are awarded against him those damages will be covered by the additional liability coverage afforded to him under his umbrella policy.  See Appleman, Insurance Law and Practice § 4909.85, at 452 (1981).

570 So.2d 595, 596 n.2 (Ala. 1990).

and witnesses;

    4)       the nature and location of any injury or damage arising out of the "occurrence" or "offense";

    c.       are assisted, upon our request, in the enforcement of any right any person or organization which may be liable to you or any other insured because of "bodily injury," "property damage," "personal injury," or "advertising injury" to which this insurance may apply; and

    d.       receive the insured's full cooperation in the investigation, adjustment, settlement, or defense of any "claim" or "suit."

In addition, it is a requirement of this policy that:

    a.       the insured not make any admission of liability;

    b.       no insured, except at their own cost, voluntarily make any payment, assume any obligations, or incur any expense, other than for incidental first aid, without our consent; and

    c.       you immediately send us copies of any demands, notices, summonses, or legal papers received in connection with a "claim" or "suit" involving you or any other insured.

(Id. at 15-16 &  Endorsement 5 (Ex. to Doc. No. 75).)

It is undisputed that Markel first was notified of the Lemuel occurrence, claim and suit on May 12, 2004, when it received a letter from Ray Gibson, Esquire, an attorney representing Admiral.[13]  (Petzold Aff., ¶¶ 3-4 (Ex. 4 to Doc. No. 75); (Froelich Dep. at 65-66 (Ex. 2 to Doc. No. 75).)  The letter referenced and attached an earlier letter dated

---

[13] Lifestar learned in late May or early June 2004, that Markel had been notified of the Lemuel claim.  (Id. Froelich Dep. at 66.)

April 26, 2004.  The April 26 letter stated that it served as "official notice" of the Lemuel claim and lawsuit.  (Petzold Aff. (Ex. 1 attached thereto).)  On May 20, 2004, Markel sent a letter to Robinson's Ambulance and Oxygen Service, Inc., the named insured on the Markel policy, acknowledging notice of the claim.  (Petzold Aff. ¶ 5.)

Prior to May 12, 2004, Markel also did not receive any legal papers, pleadings or other documentation from Lifestar or any other party concerning the Lemuel occurrence, claim or lawsuit.  (Id. ¶¶ 3-4.)  At the time Markel received this first notice, the Lemuel case was on appeal to the Supreme Court of Alabama.

D.   Procedural History Leading to these Consolidated Proceedings

On October 7, 2003, after obtaining the default judgment against Lifestar, Lemuel filed a garnishment action against Admiral in state court, seeking to have the $1,000,000 policy limit applied toward payment of the default judgment.  On November 12, 2003, Admiral removed the garnishment action to the United States District Court for the Middle District of Alabama, (see 2:03cv1101-D), on the ground that the garnishment proceedings constituted a separate civil cause of action with diversity of the parties.  See Butler v. Polk, 592 F.2d 1293, 1295-96 (5th Cir. 1979) (garnishment actions to collect post-judgments are separate civil actions which are removable).  Contemporaneously therewith, Admiral filed a declaratory judgment action in this court, (see 2:03cv1102), stating that a "judicial controversy exists as to whether Admiral is obligated under its policy to provide defense or indemnity for the default judgment obtained in the Lemuel

lawsuit."  (See Lemuel v. Admiral, 2:03cv1102-D (Doc. No. 1, ¶ 20).)  Admiral named as Defendants in its declaratory judgment action Lemuel and Lifestar and moved to consolidate that action with the garnishment proceeding.  (Id.; Doc. No. 3.)  In an order entered on December 16, 2003, this court granted the motion to consolidate.  (Doc. No. 5.)

On October 5, 2004, Markel filed a separate complaint against Lifestar and Lemuel for a declaratory judgment.  Therein, Markel asserts, in part, that "there is no coverage under the Markel policy because of Lifestar's failure to provide notice of an Occurrence, a Claim and Suit in the manner required by the policy conditions" and seeks a declaratory judgment to that effect.  (Doc. No. 86 at 9-10.)  The Markel declaratory judgment action was consolidated with the Admiral/Lemuel actions on November 19, 2004, (Doc. No. 13); thus, all three lawsuit are now pending before the undersigned.

## V.  DISCUSSION

The substantive issue in this case is whether Lifestar gave timely notice of the Lemuel claim and suit to Admiral and Markel, in light of the policies' express conditions that the insured give notice "as soon as practicable/possible" and forward suit papers "immediately."  The answer to this issue is decisive of whether, in these declaratory judgment actions, Admiral and Lifestar are liable for any portion of the default judgment taken against their insured, Lifestar, pursuant to their respective policies.

Before addressing the merits, the court will address the threshold issues concerning choice-of-law considerations and the application of collateral estoppel and/or *res judicata* as pertains to certain aspects of the judgment of the state court in the Lemuel litigation.

## A. Choice of Law

Choice-of-law issues have been raised by the parties concerning which state's substantive laws govern the coverage disputes under the Admiral and Markel insurance policies. The court, thus, turns to the parties' competing positions as to which state's laws govern in these proceedings.

### 1. *The Admiral Policy*

Lemuel and Lifestar contend that, contractually, the parties to the Admiral policy agreed that New York law would govern.[14] (Doc. No. 46 at 8; Doc. No. 47 at 11.) Alternatively, they assert that application of Alabama's rule of *lex loci contractus* yields the same result because the contract of insurance was issued and delivered in New York. (Doc. No. 46 at 10; Doc. No. 47 at 11-12.)

---

[14] Lemuel cites language from the policy which states: "The terms of this policy which are in conflict with the statutes wherein this contract is issued are hereby amended to conform to such statutes."

Admiral, on the other hand, contends that "an equally valid argument can be made for the application of Alabama law." (Doc. No. 48 at 3.) Citing the "receipt and acceptance" rule of *lex loci contractus*, Admiral asserts that, because Lifestar "is an Alabama corporation doing business in Alabama, 'receipt and acceptance' with regard to the Alabama business entity arguably occurred in Alabama." (Id.) Alternatively, Admiral states that it may be that an exception to the *lex loci contractus* governs, because "performance and coverage of the Admiral policy was to occur in the state where Lifestar operated its business and where the claim arose, i.e., Alabama." (Id. at 4-5 (citing *Ex parte* Owen, 437 So.2d 476, 481 (Ala. 1983).) Regardless, Admiral contends that the choice of law issue is "moot," because New York law "is even more adverse to [Lemuel's and Lifestar's] coverage position than the law in Alabama." (Doc. No. 48 at 3.)

When a federal court exercises diversity-of-citizenship jurisdiction, the Erie doctrine extends to choice-of-law questions, so that the federal court is bound by the choice-of-law rules of the state in which it is sitting. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)); Cooper v. Am. Express Co., 593 F.2d 612, 613 (5th Cir. 1979). Alabama's choice-of-law rules follow the traditional principle of *lex loci contractus*, which provides that a contract is "governed by the laws of the state where it is made[.]" Cherry, Bekaert & Holland v. Brown, 582 So.2d 502, 506 (Ala. 1991); see also Macey v. Crum, 30 So.2d 666, 669 (Ala. 1947) ("The *lex loci* controls the validity and construction of the contract but the *lex fori* operates on the remedy to enforce it."); Brown Mach. Works & Supply,

Inc. v. Ins. Co. of N. Am., 951 F. Supp. 988, 992 (M.D. Ala. 1996) (applying Alabama's

*lex loci contractus* rule to resolve choice-of-law issue).  A contract is "made" where it is

executed, and generally the last act essential to the execution of the policy is the "receipt

and acceptance" of the policy, meaning that typically the laws of the state in which this

last act occurred governs.  See Ailey v. Nationwide Mut. Ins. Co., 570 So.2d 598, 599

(Ala. 1990) (place of issuance); Ferris v. Jennings, 851 F. Supp. 418, 421 (M.D. Ala.

1993) (place where made and delivered).  The principle of *lex loci contractus*, however,

does not apply when the insurance policy contains a provision specifying the source of

law, see Cherry, Bekaert & Holland, 582 So.2d at 506, or where the contract "is to be

wholly performed in some other place."  *Ex parte* Owen, 437 So.2d at 481.

        The first step in a choice-of-law analysis is to determine whether an actual conflict

exists between the substantive laws of the interested jurisdictions, here, Alabama and

New York.  See Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997).

If there is no conflict between the competing bodies of law, as the court finds to be the

case here, the court need not decide which state's laws govern.  See id.; see also Scott v.

Prudential Sec., Inc., 141 F.3d 1007, 1012 (11th Cir. 1998) ("We . . . need not resolve

this choice of law problem because the relevant law in both states is essentially in

harmony."); U.S. v. McCleskey Mills, 409 F.2d 1216, 1217 (5th Cir. 1969) (where there

is no conflict, no choice of law is necessary).

(a)  Alabama law

Pursuant to Alabama law, when a primary insurance policy requires notice "as soon as practicable" or "immediately," the insured is required to give notice "'within a reasonable time' in view of all the facts and circumstances of the case," and the insured's failure to do so releases the insurer from providing coverage.  Southern Guar. Ins. Co. v. Thomas ("Thomas"), 334 So.2d 879, 882-83 (Ala. 1976); Pharr v. Cont'l Cas. Co., 429 So.2d 1018, 1019 (Ala. 1983) ("The terms 'as soon as practicable' and 'immediately' . . . have been generally construed to mean that notice must be given within a reasonable time in view of the facts and circumstances of the case.").  The reasonableness of the delay is a question of fact for the jury "[w]here facts are disputed or where conflicting inferences may reasonably be drawn from the evidence."  Thomas, 334 So.2d at 882.  On the other hand, if the "'insured fails to show a reasonable excuse or the existence of circumstances which would justify a protracted delay,'" the court should find as a matter of law that there has been a breach of the notice provision of the policy.  Id. at 882-83.

In Thomas, the Supreme Court of Alabama rejected the insured's argument that "the absence of prejudice to the insurer from the delay" is a material consideration.  Id. at 883.  The court explained, that pursuant to its precedent, "whether the insurer was prejudiced by the delay is immaterial to a determination of the reasonableness of the delay where the giving of reasonably timely notice is expressly made a condition precedent to any action against the insurer," as in the case before it.  Id. at 883.  The

Supreme Court of Alabama, therefore, concluded that only two factors bear on the issue of reasonableness: "the Length of the delay and the Reasons for the delay." Id.

In that case, the determinative issue was "whether the insured's excuses, offered for his six-month delay in giving notice to his insurer, [were] reasonable." Id. at 883. The court concluded that each of the reasons offered by the insured were insufficient to justify the inordinate delay and that, thus, "the delay was unreasonable as a matter of law." Id. at 883-885.

Thomas does not stand alone. Other Alabama opinions have relied on Thomas to deny coverage at the summary judgment stage based upon late notice. See Pharr, 429 So.2d at 1018-20 (insured's eight-month delay in notifying insurer after having received service of complaint was unreasonable where there was no evidence of any excuse for the delay); B & M Homes, Inc. v. Am. Liberty Co., 356 So.2d 1195, 1195-96 (Ala. 1978) (insured's failure to notify insurer of suit against insured for seven months after receipt of service of complaint was unreasonable as a matter of law where a condition precedent to coverage was timely notice of the claim or lawsuit and insured offered no excuse for delay).

Notably, in each of the foregoing cases, a judgment had not been entered. Not surprisingly then, Alabama courts have held that an insurer is not contractually obligated to pay a default judgment entered against its insured when the insurer did not receive pre-judgment notice of the suit.

Watts v. Preferred Risk Mutual Insurance Co. involved an insured's failure to "immediately forward legal process to the insurer[,]" as required by an automobile liability policy. See 423 So.2d 171, 173 (Ala. 1982). Harold Ware ("Ware"), the driver, was involved in an automobile accident, and his passenger, Teena Watts ("Watts"), sustained injuries in the crash. See id. at 172. Ware's automobile liability carrier, Preferred Risk, received prompt notice of the accident, investigated the accident and paid the medical bills incurred by Watts. See id. Watts subsequently filed a lawsuit against Ware seeking compensation for injuries she sustained in the accident. Ware, however, did not answer the complaint, and, as a result, Watts obtained a default judgment against him. See id. Ware never notified Preferred Risk about the lawsuit. See id. at 172-73.

Preferred Risk then filed a declaratory judgment, seeking a ruling that it was not liable for the default judgment because it had not received notice of Watts' lawsuit. See id. Affirming the trial court's summary judgment in favor of Preferred Risk, the Supreme Court of Alabama stated the following:

> Watts and Ware argue that the trial court erred in granting summary judgment in favor of Preferred Risk because there was a material issue of fact on the question of notice. . . No issue of fact exists on this question. The insurance policy contains a standard provision which requires as a condition precedent to any action on the policy that the suit papers in any action against the insured be forwarded immediately to the company. There is no factual dispute, and it is in fact admitted by both Ware and Watts, that neither defendant forwarded any suit papers at any time to Preferred Risk. Neither Ware nor Watts informed Preferred Risk or any of its representatives that suit had been filed against Ware until after damages had been proved and a default judgment entered. . . . There is no dispute on this issue, and summary judgment was correctly entered in favor of Preferred Risk.

Id. at 173.  Furthermore, the Court explained:  "The purpose of the provision that the insured immediately forward legal process to the insurer is to afford the insurer an opportunity to control the litigation. . . .  Preferred Risk never had that opportunity in this case."  Id.; see also Safeway Ins. Co. v. Bailey ("Bailey"), 748 So.2d 218, 221 (Ala. Civ. App. 1999) (holding that insurer was not obligated to provide coverage for default judgment entered against its insured because it was not given notice of the suit until after judgment was entered; the insurer "never had the opportunity to control the litigation, because a judgment had been entered before Safeway had knowledge that a lawsuit had been filed.").

Moreover, in Webb v. Zurich, applying Alabama law, the Eleventh Circuit reached a similar result as in Bailey, supra.  See 200 F.3d 759 (11th Cir. 2000).  It held that, even though the insurer had notice of a pre-suit claim, the insurer was not required to pay a default judgment entered against its insured.  Contrary to a policy provision, the insured failed to forward suit papers or give the insurer notice of the lawsuit prior to entry of the default judgment.  Affirming the summary judgment entered by the district court in favor of the insurer, the Eleventh Circuit explained that under Alabama law "a plaintiff cannot recover a damage award from an insurance company if there is a policy provision requiring that the insurance company receive notice of a lawsuit if the plaintiff and the insured fail to provide the insurer with adequate post-filing notice of the lawsuit."  Id. at 761.

27

(b)  New York Law

New York courts employ a test which parallels the one applied in Alabama regarding an insured's duty to provide notice of claim or suit to a primary insurance carrier.[15]  "When the terms of the policy require that an insured give notice of a claim 'as soon as practicable,' the insured must give notice . . .  within a reasonable time under all the circumstances."  Owen v. Allstate Ins. Co., 673 N.Y.S.2d 477, 479 (N.Y. App. Div. 1998) (citations omitted).  Furthermore, as observed by the Second Circuit, under New York law, the issue of "whether notice was given within a reasonable time" presents a "question of law" appropriate for resolution at the summary judgment when "(1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay."  State of New York v. Blank, 27 F.3d 783, 795 (2d Cir. 1994).

Moreover, New York courts, like Alabama courts, do not require a primary insurer to demonstrate prejudice when an insured fails to give timely notice of a claim in contravention of policy terms.  See Argo Corp. v. Greater New York, 827 N.E.2d 762, 764-65 (N.Y. 2005).  Regarding the application of the no prejudice rule to notice-of-occurrence provisions, in Argo, the New York Court of Appeals, the state's highest court, acknowledged that

───────────────

[15] Indeed, in Thomas, *supra*, the Supreme Court of Alabama cited a New York opinion as authority in support of its holding.  See Thomas, 334 So.2d at 883 (citing Zurich Gen. Accident & Liab. Ins. Co. v. Harbil Rest., Inc., 184 N.Y.S.2d 51, 53 (1959)).

> [f]or years the rule in New York has been that where a contract of primary insurance requires notice "as soon as practicable" after an *occurrence*, the absence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract.  No showing of prejudice is required.  Strict compliance with the contract protects the carrier against fraud or collusion; gives the carrier an opportunity to investigate claims while evidence is fresh; allows the carrier to make an early estimate of potential exposure and establish adequate reserves and gives the carrier an opportunity to exercise early control of claims, which aids settlement.

See id. at 764 (internal citations omitted) (emphasis added).  As a matter of first impression, the Court of Appeals extended the "no prejudice" rule to an insured's late notice of a *claim* to a primary liability insurer.  See id. at 765.  It held:

> A liability insurer, which has a duty to indemnify and often also to defend, requires timely notice of lawsuit in order to be able to take an active early role in the litigation process and in any settlement discussions and to set adequate reserves.  Late notice of lawsuit in the liability insurance context is so likely to be prejudicial to these concerns as to justify the application of the no-prejudice rule.

Id.; see also AXA Marine and Aviation v. Seajet Indus., 84 F.3d 622, 624-26 (2d Cir. 1996) (predicting that New York courts would expand no prejudice rule to cases "involving the failure to give notice of claim" given the similarities between the purposes of "notice of occurrence" and "notice of claim" provisions in insurance policies).

In Argo, despite the insurance policy's requirement that the insured notify the insurer of an occurrence or a lawsuit "as soon as practicable" and "immediately" forward suit papers, the insured did not notify its commercial liability insurance carrier until fourteen months after it had received service of the summons and complaint and six months after a default judgment was entered against the insured.  827 N.E.2d at 763 n.3,

29

765.  The Court of Appeals held that the defaulting insured's "delay was unreasonable as a matter of law and thus, its failure to timely notify [the insurer] vitiate[d] the contract." Id.  The court in Tennant v. Farm Bureau Mut. Auto. Ins. Co., similarly observed as follows:

> Notice of the commencement of an action is a condition upon which the insurer's obligation to defend its insured and indemnify him in the end is strictly dependent. . . .  Clearly the parties never contracted that the defendant would pay a default judgment which the insured permitted to be taken against him without any notice to, or knowledge of the insurer of the commencement of the action.  No mistake, inadvertence or unforeseen contingency on the part of the insured will suffice to excuse noncompliance with the condition of the policy requiring the insured to give notice of the commencement of the action.

141 N.Y.S.2d 449, 453 (N.Y. App. Div. 1955).

Additionally, as noted by Admiral, at least one New York lower court has ruled explicitly that an insurer is not required to indemnify a default judgment where the insurer did not have the opportunity to defend the suit on the merits:

> Although the failure of the insured to forward the summons and complaint would not foreclose a judgment against the insurer in the event notice of the pendency of the action was given to the insurer by the injured party with the opportunity afforded the insurer to interpose an answer and to defend on the merits, it is clearly beyond any provision [of law] to permit a recovery where there has been no opportunity afforded the insurer to defend the action against the insured on the merits.

Zappia v. Allstate Ins. Co., 212 N.Y.S.2d 698, 698 (N.Y. Sup. Ct. 1961) (internal citation omitted).  The law in New York, thus, is established that an insured forfeits coverage under a liability insurance policy if the claim is not reported in a timely and reasonable manner.

30

Lemuel, however, argues that New York law differs from Alabama law in one respect.  Specifically, she asserts that, pursuant to New York law, an insurer can waive its right to rely on an insured's late notice as a basis for denying coverage and that Admiral has done so in this case.[16]  (Doc. No. 46 at 10, citing First Fin. Ins. Co. v. Jetco Contracting Corp., 801 N.E.2d 835 (N.Y. 2003) ("Jetco")).  Relying on Jetco, Lemuel asserts that "'[a]n insurer's unexplained failure to provide notice as soon as is reasonably possible precludes an effective disclaimer even though the policyholder's own notice of the incident to its insurer is untimely[.]'"  (Id. at 12 (quoting Jetco, 801 N.E.2d at 837).)  Lemuel contends that, although Admiral learned of facts surrounding the entry of the default judgment in June 2003, and unequivocally knew no later than June 19, 2003, of facts giving rise to a possible late notice defense, "Admiral has yet to notify the insured [i.e., Lifestar] in writing that it is disclaiming coverage as required by New York law." (Id. at 11.)  According to Lemuel, under New York law, Admiral's failure to provide Lifestar a written disclaimer in a timely manner constitutes a waiver of its right to assert Lifestar's late notice as a ground for disclaimer.

Admiral, however, contends that, by its express terms, the statute is inapplicable in this action.  (Doc. No. 48 at 10-13.)  For the reasons to follow, the court agrees with Admiral.

---

[16] Lifestar asserts the same argument, and, like Lemuel, advocates for the application of New York law.  (Doc. No. 47 at 10-12.)

In support of her position, Lemuel has relied upon numerous opinions issued by New York courts.  (See Doc. No. 46 at 10-16, citing, among others, Jetco, *supra*; Allcity Ins. Co. v. Jimenez, 581 N.E.2d 1342 (N.Y. 1991); Hartford Ins. Co. v. Nassau County, 389 N.E.2d 1061 (N.Y. 1979); Pawley v. Harleysville, 782 N.Y.S.2d 660 (N.Y. App. Div. 2004); Alvarez v. Allstate Ins. Co., 773 N.Y.S.2d 298 (N.Y. App. Div. 2004); Progressive Northeastern Ins. Co. v. Cirocco, 771 N.Y.S.2d 717 (N.Y. App. Div. 2004); and Ins. Corp. of New York v. Empire Constr. Corp. of Long Island, 799 N.Y.S.2d 161 (N.Y. Sup. Ct. 2004) (unpublished opinion).)  All of the opinions cited by Lemuel involve the validity of an insurer's disclaimer under a unique New York statute, namely New York Insurance Law § 3420(d).

That statute reads as follows:

If under a liability policy delivered or issued for delivery in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident *occurring within this state*, it shall give written notice as soon as reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant.

N.Y. Ins. Law § 3420(d) (2005) (emphasis added).

By its very terms, the statute applies only to accidents which occur within the State of New York.  New York courts expressly have recognized the inapplicability of § 3420(d) when the accident happened outside the boundaries of New York.  For example, in Transportation Insurance Co. v. Cafaro, the court held that because the

32

accident at issue happened in Aruba, not New York, the appellant's reliance on § 3420(d)
was misplaced:

> Contrary to the appellant's contention, Transportation Insurance Company
> (hereinafter Transportation) validly disclaimed coverage regarding her
> claim for underinsured motorist benefits.  Insurance Law § 3420(d) requires
> an insurer to give written notice of a disclaimer as soon as is reasonably
> possible to the insured, the injured person, or any other claimant, when an
> accident occurs within the State of New York.  However, since the accident
> in this case occurred in Aruba, Insurance Law § 3420(d) is inapplicable
> Accordingly, Transportation was not precluded from disclaiming coverage.

744 N.Y.S.2d 700, 700 (N.Y. 2d Dep't 2002) (internal citation omitted); Brennan v.

Liberty Mut. Fire Ins. Co., 612 N.Y.S.2d 237, 238 (N.Y. App. Div. 1994) ("Insurance

Law § 3420(d) requires an insurer to provide reasonably prompt written notice of a

disclaimer of accidents which occur within the State of New York to the insured, the

injured person, or 'any other claimant.'  Since the accident in this case occurred in

Florida, Insurance Law § 3420(d) is inapplicable.") (internal citation omitted); Kamyr,

Inc. v. St. Paul Surplus Lines Ins. Co., 547 N.Y.S.2d 964, 967 (N.Y. App. Div. 1989)

("Last, we agree with St. Paul that Insurance Law § 3420(d) is inapplicable since the

underlying claim arises from an accident occurring without the State and involving

neither bodily injury nor death.").

Here, the accident allegedly resulting in the death of Lemuel's husband occurred in

Alabama.  The accident did not occur in New York; thus, § 3420(d), by its plain

language, is not relevant to any issue at hand.  Even assuming *arguendo*, without

deciding, therefore, that Admiral failed to give timely notice of its disclaimer (an assumed

33

fact with which Admiral strongly disagrees), Admiral is not statutorily precluded by virtue of § 3420(d) from now raising policy defenses to disclaim coverage for the Alabama incident.[17]

### (c)  Conclusion

Having considered the laws of Alabama and New York, the court finds that the holding espoused by New York's highest court in <u>Argo</u>, *supra*, as applied by that state's lower courts, is substantially similar to the laws of Alabama pronounced in <u>Watts</u>, *supra*, <u>Safeway</u>, *supra*, <u>Thomas</u>, *supra*, and <u>Webb</u>, *supra*.  Under both states' laws, when an insurance policy contains a condition precedent to coverage that the insured provide prompt notice of a claim or suit, the insured must comply with that condition in a timely

---

[17] In her "Reply" (Doc. No. 56), although not expressly conceding the inapplicability of the New York statute, Lemuel has acknowledged that Admiral "appears to be correct." (<u>See</u> Doc. No. 56 at 5.)  Nonetheless, Lemuel maintains that, at the very least, Admiral is estopped from disclaiming coverage based upon common-law grounds of waiver and equitable estoppel.  (<u>Id.</u>)  She asserts that, once Admiral obtained notice of the Lemuel lawsuit in June 2003, it retained the services of an attorney to represent Lifestar and, from that point forward, "controlled the litigation of the matter to the exclusion of Lifestar." (<u>Id.</u> at 5-6.)  Underlying this argument is a disagreement between the parties as to whether Bert Taylor, Esquire, was retained by Lifestar or by Admiral.  The court, however, deems this factual dispute to be one that is not material to the resolution of Admiral's pending summary judgment motion.  Namely, the court has given due consideration to Lemuel's common law waiver and estoppel arguments; however, the court finds that the letters sent by Admiral to Lifestar in June 2003 cannot be construed as a waiver of its rights to assert policy defenses during the litigation, nor is the court persuaded that Admiral otherwise acted in a manner evidencing an intent to abandon its defenses.  (<u>See</u> Doc. No. 48 at 13 n.4 & Exs. attached thereto; Doc. No. 58 at 2-3); <u>Albert J. Schiff Assocs. v. Flack</u>, 51 N.Y.2d 692, 698-99 (N.Y. 1980).

manner.  Absent a valid reason for the untimely delay, the notice is deemed unreasonable, and the determination may be rendered by the court as a matter of law where the facts surrounding the delay are undisputed.  Moreover, neither Alabama nor New York factor into its analysis whether the late notice prejudiced the insured.

The court, therefore, concludes that there does not exist a conflict between the laws of Alabama and New York with respect to an insured's duty to report timely a claim to the insurer.  In other words, because the laws of both jurisdictions are substantially the same with respect to the contract issues raised in this litigation, the outcome is the same regardless of whether the court employs New York law or Alabama law.  The court, thus, finds that it need not determine which state's substantive laws apply.

## 2. The Markel Policy

Lemuel and Lifestar urge the application of New Jersey law as to the coverage dispute under the Markel policy.  They state that Markel delivered the policy to its wholesale insurance broker, Oxbridge Insurance Associates, Inc. ("Oxbridge"), in Morristown, New Jersey.  Oxbridge, in turn, delivered the policy to Lifestar's retail insurance broker, Capacity Coverage Company ("Capacity") of New Jersey at its office in Upper Saddle River, New Jersey.  Capacity, as Lifestar's agent, accepted the policy on behalf of Lifestar.  (Doc. No. 101 at 16-17; Doc. No. 103 at 3-4, 6 (citing Levey Sworn Statement (Ex. C. to Doc. No. 103).)  Applying Alabama's rule of *lex loci contractus*, discussed *supra*, Lemuel and Lifestar contend that because the issuance, delivery, receipt

35

and acceptance of the policy occurred in New Jersey, the laws of New Jersey govern the insurance coverage dispute under the Markel policy.  (Doc. No. 101 at 16; Doc. No. 103 at 7 (citing United Ins. Co. of Am. v. Headrick, 157 So.2d 19, 22 (Ala. 1963) (delivery to agent is delivery to insured).)

In its memorandum brief in support of its summary judgment motion, but without discussion of choice-of-law principles, Markel cites both Alabama and New York law in support of its position that Lifestar's late notice vitiates the policy.  (See Doc. No. 76.)  In its reply, however, addressing Lifestar's and Lemuel's position as to the application of New Jersey law, Markel states that choice of law is a "non-issue."  (Id. at 5.)  According to Markel, "it makes no difference whether this Court applies the law of New York or New Jersey or Alabama because the law of each state warrants a finding of no coverage under the Markel policy."  (Id.)

The court agrees with Markel that it need not decide which state's laws apply because the result would be the same under the laws of Alabama, New Jersey or New York.  See C.P. Apparel Mfg. Corp. v. Microfibres, Inc., 210 F. Supp.2d 272, 273 n.4 (S.D.N.Y. 2000).  In the preceding section, the court set out the governing standards under Alabama and New York laws where an insurance policy contains as a condition precedent to coverage that the insured provide notice to a primary insurer "as soon as practicable" of an occurrence, claim or suit, but the insured fails to comply with the

provision by delaying notice.[18]  Although these opinions pertain to the liability of a

*primary* insurance carrier, the length of the delay and the reasons for the delay also must

be considered in the context of excess insurer's assertion of late notice.  See, e.g.,

Midwest Employers Cas. Co. v. East Ala. Health Care, 695 So.2d 1169, 1172 (Ala. 1997)

Alabama and New Jersey courts, however, impose an additional requirement upon an

excess insurer; an excess insurer also must demonstrate that it was prejudiced by the late

notice.  See Midwest Employers Cas. Co., 695 So.2d at 1173 ("[W]e hold that an excess

insurer is required to show prejudice when it bases its denial of a claim . . . on an alleged

failure to comply with notice provisions of the policy."); Ethicon, Inc. v. Aetna Cas. &

Surety Co., 805 F. Supp. 203, 204 (S.D.N.Y. 1992) (discussing and applying New Jersey

law).  To the contrary, under New York law, an excess insurer need not demonstrate

prejudice in order to succeed on a late notice defense.  See Am. Home Assur. Co. v. Int'l

---

[18]  Under New Jersey's substantive law, the standard for determining whether an
insured has breached a notice provision in an insurance policy is in accord with that of
Alabama and New York:

> The purpose of a notice of loss provision is to allow the insurer an
> opportunity to commence investigation and to protect its interests.  The
> phrase "as soon as practicable" has uniformly been construed to mean
> "within a reasonable time."  The question as to what is a reasonable time
> depends on the facts and circumstances of the particular case, and it is a
> question of fact for resolution by the jury or fact-finder, unless the basic
> facts are undisputed and only one inference can reasonably be drawn
> therefrom.

Peskin v. Liberty Mut. Ins. Co., 520 A.2d 852, 856-57 (N.J. Super. Law Div. 1986)
(internal citations omitted), aff'd in part, remanded in part on other grounds, 530 A.2d
822 (N.J. Super. Ct. App. Div. 1987).

Ins. Co., 90 N.Y.2d 433, 437-38 (N.Y. 1997) (extending no-prejudice exception to excess

insurer; holding that an excess insurer has same interests as a primary insurer).

      As discussed below, the court finds that there is no factual dispute that Markel

suffered prejudice due to Lifestar's late notice.  The court, thus, need not decide whether

*lex loci contractus* obligates the court to apply the no-prejudice substantive law of New

York or the substantive laws of Alabama and New Jersey which impose a higher standard

on the excess insurance carrier by requiring it to demonstrate prejudice as a result of the

insured's delay in notice.

      Lemuel and Lifestar, however, argue that there is an important, practical difference

under New Jersey law.  They contend that, pursuant to New Jersey law, Admiral (as the

primary insurer) bore the burden of notifying Markel, not Lifestar, and that the contrary

provision in the Markel policy placing the burden of notification on Lifestar is "nullified"

under New Jersey law.  (Doc. No. 103 at 7-8; Doc. No. 101 at 15-16.)  They rely on

American Centennial Insurance Co. v. Warner-Lambert Co., 681 A.2d 1241, 1245-46

(N.J. Super. Ct. Law Div. 1995).  Markel, however, disagrees with Lifestar's and

Lemuel's interpretation of American Centennial, asserting that, "[a]t no point in [its]

decision did the court state, or even infer, that New Jersey law negates a policy provision

requiring the insured to give the insurer notice of the claim or suit."  (Doc. No. 104 at 9.)

For the reasons to follow, the court agrees with Markel and finds that American

Centennial does not support the proposition for which it is cited by Lemuel and Lifestar.

American Centennial involved a declaratory judgment action by an excess insurer against a primary insurer, in which the excess insurer alleged that the primary insurer breached a duty to notify it of an underlying claim against the insured which ultimately resulted in a judgment implicating the limits of the excess policy. See 681 A.2d at 1243. Relying on written standards within the insurance industry, see id. at 1246, the court concluded that implicit in the relationship between a primary and excess insurer is a "duty of good faith" on the part of the primary carrier to act in the interest of the excess carrier in defending and settling claims. Id. at 1247. The duty of good faith, in turn, requires the primary insurer to notify an excess carrier of the existence of a claim. See id. at 1245. In American Centennial, the court aligned itself with the minority view, by holding that the duty of notice owed by the primary insurer permitted a direct action against the primary insurer by the excess insurer. See Cont'l Cas. Co. v. Pullman, Comley, Bradley & Reeves, 929 F.2d 103, 106-07 (2d Cir. 1991).

The court finds that, applying the holding of American Centennial to the facts of this case so as to extinguish the separate, contractual notice provision between Lifestar (the insured) and Markel (the excess insurer) would constitute an unsupported extension of that court's holding. (See Doc. No. 104 at 8.) The independent contractual duties of the insured to provide notice to the excess insurer simply were not at issue in American Centennial and were never discussed by the court. Indeed, one of the authoritative treatises on insurance law, Couch on Insurance, has observed that the duty of a primary insurer to notify an excess insurer of its potential exposure to liability is "separate and

39

distinct from the insured's obligation to promptly notify the excess insurer of an appropriate claim.  In some instances, the primary insurer as well as the insured may have the obligation to provide notice."  Couch on Insurance, § 186:1 (3d ed. 2005).

Accordingly, the court finds that <u>American Centennial</u> does not stand for the proposition that a primary insurer's implied duty to provide notice of a claim to an excess insurer supplants the insured's independent contractual duty to do so.  Lemuel and Lifestar have not cited any other legal authority in support of their position, and the court is aware of none.  As such, Lemuel and Lifestar have not persuaded the court that New Jersey law eradicates contractual provisions which require an insured to provide its excess insurance carrier with prompt notice of claims.

B.  <u>Collateral Estoppel and *Res Judicata*</u>

_____The date Lifestar had actual notice of the Lemuel complaint is a pivotal factual issue in these consolidated proceedings; Lifestar pinpoints the date as June 3, 2003, while Admiral and Markel contend that the date was January 7, 2003, as ascertained by the state court.[19]  Resolution of the issue of when Lifestar received actual notice depends upon whether certain findings of the state court's judgment in the Lemuel litigation should

---

[19] Lemuel has not joined Lifestar in contesting the findings of the state court as to the date Lifestar obtained actual notice of her lawsuit; to do so would require her to take a position inconsistent with the one she asserted during the state court proceedings.  Indeed, she has taken "no position" on whether sufficient notice was provided by Lifestar; she, however, points out that the issue of notice has not been "concede[d]" by Lifestar.  (<u>See</u> Doc. No. 56 at 2.)

be given preclusive effect pursuant to the principles of collateral estoppel and/or *res judicata*.  (<u>See</u> Doc. No. 48 at 2 n.1.)

Admiral asserts that Lifestar, as a party to the state court proceedings, is barred by the doctrines of collateral estoppel and/or *res judicata* from relitigating the findings of the state court surrounding the date Lifestar received notice of the Lemuel litigation.  (<u>Id.</u>; <u>see also</u> Doc. No. 26 at 3-4.)  In other words, because the Supreme Court of Alabama affirmed the circuit court's judgment which was based, in part, on a finding that Lifestar received actual notice of the Lemuel lawsuit on January 7, 2003, Admiral contends that this court is bound by that finding and that Lifestar cannot relitigate the issue in these proceedings.

Lifestar, on the other hand, contends that neither collateral estoppel nor *res judicata* precludes it "from demonstrating when it actually received notice that the Lemuel Action was against Lifestar[.]"  (Doc. No. 101 at 10.)  Disagreeing with the state court finding that it was on notice of the Lemuel lawsuit by receipt of process on January 7, 2003, it insists that it did not receive notice of the lawsuit until June 3, 2003, when a news reporter called its regional vice president in Montgomery, Alabama, seeking a

comment as to the $5,000,000 default judgment.[20]  (Doc. No. 47 at 14.)  (see Policy at 5, Ex. A to Doc. No. 46.)

A federal court is bound by 28 U.S.C. § 1738, the full faith and credit doctrine, to give a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered.  Stockton v. Lansiquot, 838 F.2d 1545, 1545-46 (11th Cir. 1988); see also McMillian v. Johnson, 878 F. Supp. 1473, 1519 (M.D. Ala. 1995), overruled on other grounds, 88 F.3d 1554 (11th Cir. 1996) ("federal courts considering whether to give preclusive effect to state court judgments must apply the State's law of collateral estoppel").  The court, thus, looks to Alabama law on collateral estoppel and *res judicata*.

Collateral estoppel, or issue preclusion, bars relitigation of an issue where:  (1) "an issue in a prior action was identical to the issue litigated in the present action"; (2) "the issue was actually litigated in the prior action"; (3) "resolution of the issue was necessary to the prior judgment"; and (4) "the same parties are involved in the two actions."  Adams v. Sanders, 811 So.2d 542, 546 (Ala. Civ. App. 2001) (citation omitted).

Citing mutuality of estoppel, i.e., a requirement of the fourth element, above, Lifestar argues that, because Admiral and Markel were not parties in the underlying state

_____

[20] Because Lifestar says that it did not receive actual notice of the Lemuel litigation until June 3, 2003, Lifestar asserts that its notice to Admiral on that same date is reasonable and complies with the Admiral policy provision that, "as a condition precedent" to coverage, Lifestar give notice "as soon as practicable" of a claim against it. (Doc. No. 47 at 12.)

court litigation, they may not rely on that judgment as determinative of the same issue in this litigation.  The court agrees.  Unlike the federal court forum, see Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979), Alabama courts have not dispensed of the requirement of mutuality of parties in applying the doctrine of collateral estoppel.  See Flexible Products Co. v. Acklin, ___ So.2d ___, 2005 WL 1316937, *9 (Ala. 2005) (noting that, with respect to both defensive and offensive collateral estoppel, Alabama requires mutuality of parties).  "Mutuality of parties" is "a judicially created doctrine declaring that unless both parties in a second action are bound by the judgment in a previous case, neither party in the second action should be bound, i.e, a nonparty as to the first action may not use the prior judgment as determinative of the same issue in the second action."  Id. at *11 (citation omitted).

Because neither Admiral nor Markel was a party to the Lemuel case, neither may take advantage of the prior judgment and bind Lifestar to it, even though Lifestar itself was a party to the prior judgment.  Although an exception to the requirement of mutuality exists where there is privity between the parties in the first and second lawsuits, that exception is inapplicable here.  See id. at *12; see also Leon C. Baker, P.C. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 821 So.2d 158 (Ala. 2001).  The only party in the Lemuel action with which Admiral and Markel arguably could be in privity is Lifestar by virtue of the insurance contracts; however, the court agrees with Lifestar that any identity of interest is negated by the fact that Admiral and Markel are its adversaries in this litigation.  See Dairyland Ins. Co. v. Jackson, 566 So.2d 723, 726-27 (Ala. 1990); Coyle v

Alabama Power Co. 611 So.2d 1019, 1021 (Ala. 1992) ("Where there is no identity of interest, privity does not exist").  Accordingly, the court finds that, pursuant to Alabama law, there is no collateral estoppel bar because the fourth element required for the operation of the doctrine is not met.

The elements of *res judicata* differ from those of collateral estoppel, however.  See Webster v. Gunter, 336 So.2d 170, 172 (Ala. 1976) (Almon, J., concurring specially) ("*Res judicata* and collateral estoppel (estoppel by judgment) are two separate rules or sets of rules for determining the conclusiveness of judgments.).  "The elements of *res judicata*, or claim preclusion, are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits."  Dairyland Ins. Co., 566 So.2d at 725.

Turning first to the third element -- substantial identity of parties --, unlike collateral estoppel, the party asserting claim preclusion need not have been a party or in privity to a party to the first action.  Rather, as articulated by the Supreme Court of Alabama,

> the "party identity criterion of *res judicata* does not require complete identity, but only that the party against whom *res judicata* is asserted was either a party or in privity with a party to the prior action or that the non-party's interests were adequately represented by a party in the prior suit, and the relationship between the party and non-party is not so attenuated as to violate due process."

Dairyland, 566 So.2d at 725-26 (citation omitted).  It matters not then for purposes of *res judicata* that Admiral and Markel were not parties in Lemuel lawsuit.  What is material is

44

that Lifestar was a party in that litigation and also is a party in this litigation.  Because Lifestar is the party against whom *res judicata* has been asserted, the third element is satisfied.

Turning to the first element, Lifestar asserts that the default judgment is not a "judgment on the merits."  (See Doc. No. 101 at 12.)  For the reasons to follow, however, the court finds unpersuasive Lifestar's abstract argument that the underlying default judgment is prohibitive of the application of *res judicata* in the context for which *res judicata*'s application is sought.  The opinions cited by Lifestar stand for the proposition that a default judgment typically cannot be given preclusionary effect as to the ultimate facts on the merits of the actual causes of action.  See Booth v. Booth, 174 B.R. 619, 623 (Bankr. N.D. Ala. 1994) (citing, among others, AAA Equip. & Rental, Inc. v. Bailey, 384 So.2d 107 (Ala. 1980)).  Here, however, the issue is not whether the default judgment is conclusive as to whether Lifestar caused the death of Lemuel's husband, the factual assertion underlying the state law causes of action.  Rather, the issue is whether there was a decision on the merits pertaining to the issue of when Lifestar received actual notice of the Lemuel lawsuit.  The fact that a default judgment was rendered simply is not prohibitive in this case.  See *In re* Bush, 62 F.3d 1319, 1324 (11th Cir. 1995) (a litigant's "abuse of the judicial process" in the first action "must not be rewarded by a blind application of the general rule denying collateral estoppel effect to a default judgment"); Walker v. Blackwell, 800 So.2d 582, 587 (Ala. 2001) (holding that in first lawsuit motion to vacate default judgment was denied on merits after consideration of both parties'

arguments, and arguments presented in second lawsuit's motion to vacate the default

judgment entered in the first lawsuit were or should have been raised in prior litigation;

thus, motion to vacate default judgment filed in second action was barred by *res*

*judicata*); cf. United Nat'l Ins. Co. v. Lee, 51 Fed. Appx. 407, 2002 WL 31655024, *2

(4th Cir. 2002) (holding that under West Virginia law collateral estoppel barred insured

from rearguing finding of state court that insured intentionally avoided service of process;

insured's contention in federal declaratory judgment action that it was unaware of lawsuit

did not justify his delay in notifying insured, thus, absolving insurer from providing

coverage for default judgment entered against insurer).

Here, the issue of Lifestar's actual notice of the Lemuel litigation was critical to

the state court's ruling on the motion to set aside the default judgment and/or for relief

from judgment.  Namely, refusing to set aside the default judgment, the circuit court

made the express finding "that 'Lifestar' received actual notice that a claim had been filed

for negligence of [its] employees" when it was served with the complaint on January 7,

2003.  (Circuit Court Order at 5-7 (Ex. E to Doc. No. 46).)  Relatedly, it concluded that,

thereafter, Lifestar engaged in conduct that was deliberately dilatory and obstructive, that

Lifestar took a "calculated risk" in not appearing in the lawsuit, and that Lifestar's

assertion that it did not believe that it was properly a defendant in the litigation was

disingenuous.  (Id. at 7-10.)  The circuit court, therefore, refused to grant relief to Lifestar

and set aside the default judgment.  Additionally, affirming the judgment of the circuit

court, the Supreme Court of Alabama similarly observed that it should have been obvious

upon receipt of the summons and complaint on January 7, 2003 that, although Care was named, "the incident described in the complaint necessarily served to identify Lifestar as the entity intended to be sued."  Lifestar, 908 So.2d at 224.  Furthermore, the Supreme Court perceived, as had the circuit court, that Lifestar's denial of notice based on the wrong designation of its name was inconsistent with Lifestar's conduct in a prior lawsuit where Lifestar had been sued under the wrong name, but had answered the complaint, indicating its correct name.  See id.

Based on the foregoing findings of the state court, the court concludes that the issue of notice was submitted for determination, was decided on the merits, and was a finding critical to the state court's judgment.  Accordingly, the court finds that there was a prior judgment on the merits of the ruling on the motion to vacate the default judgment so as to satisfy the first element.

Because the second element is not in dispute, the remaining issue is whether the "cause of action" is the same in the Lemuel lawsuit and in this litigation, as required under the fourth element of the *res judicata* test.  Lifestar argues that the differences in the forms of the two lawsuits (a wrongful death action as opposed to insurance coverage issues within declaratory judgment actions) demonstrate that the causes of actions are "separate and distinct."  (Doc. No. 101 at 12-13.)  The court disagrees.

Under Alabama law, it is well settled that differences in the form of the proceedings in which the material issue was presented in the earlier and subsequent action is not the proper focus of the inquiry for ascertaining the applicability of *res*

47

*judicata*.  See Geer Bros., Inc. v. Crump, 349 So.2d 577, 580 (Ala. 1977) ("Even though the forms of the action, past and present, are different, if substantially the same evidence supports their issues, the judgment in the former action is a bar to the latter.").  In Dominex, Inc. v. Key, the Supreme Court of Alabama held that the *res judicata* element requiring identity of claims "depends on whether the issues in the two suits are the same and whether the same evidence would support a recovery in both suits."  456 So.2d 1047, 1054 (Ala. 1984).  "Regardless of the form of the action, the issue is the same when it is supported in both actions by substantially the same evidence.  If it be so supported, a judgment in one action is conclusive upon the same issue in any suit, even if the cause of action is different."  Garris v. South Alabama Prod. Credit Ass'n, 537 So.2d 911, 914 (Ala. 1989) (citing Dominex, Inc., *supra*); see also Thomas v. Lynn, 620 So.2d 615, 616 (Ala. 1993) (same).  Stated differently, "a cause of action in one case is the same as that in a second case if the evidence needed to sustain the second action would also have sustained the first action."  George v. White, 837 F.2d 1516, 1519 n.2 (11th Cir. 1988) (citation omitted) (discussing the "same cause of action" requirement under Alabama's *res judicata* doctrine); see also Equity Resources Mgmt. v. Vinson, 723 So.2d 634, 637 (Ala. 1998) ("the determinative inquiry is whether the claims in both actions arise out of, and are subject to proof, by the same evidence").

Here, in the underlying lawsuit, when the circuit court was considering whether to set aside the default judgment against Lifestar, as discussed above, a critical issue was whether or not Lifestar had actual notice of the complaint, but deliberately failed to

48

appear or provide a defense in the Lemuel litigation.  (See, e.g., Circuit Court Order at 5, Ex. E to Doc. No. 46 ("The issues before this Court turn initially upon whether or not 'Care' and/or 'Lifestar' received notice of the action pending against them.").)  As will be discussed in more detail later in this opinion, the decisive issue in this case is the same. Namely, whether Lifestar is excused for the delay in notifying Admiral and acted "as soon as practicable," as required by the policy's terms, is contingent upon when Lifestar actually learned of the Lemuel lawsuit.  The court, therefore, finds that the issues are the same in both actions.

Furthermore, the court finds that the issues in both actions "arise out of, and are subject to proof, by the same evidence."  Equity Resources Mgmt., 723 So.2d at 637. Namely, in these proceedings, the evidence which Lifestar says proves that its delay in giving notice to Admiral of the Lemuel lawsuit is excused also would have constituted proof in the state court litigation on the issue of whether Lifestar intentionally failed to

appear and defend the Lemuel lawsuit.[21]  (See Doc. No. 47 at 6, 14, in which Lifestar

argues that in this litigation it has submitted evidence which refutes the findings of the

circuit court as to the date of Lifestar's actual notice and demonstrates that the circuit

court "erroneously found knowing, intentional, flagrant disregard for the process of the

court by Lifestar.")

*Res judicata* is premised on the principle that at some point there must be an end

to litigation, and the court finds that the state court litigation is that end.  The state court

made the express finding that Lifestar received actual notice of the Lemuel complaint on

January 7, 2003.  Explaining its reasoning, the state court rejected Lifestar's argument that

because it was not properly named, it was not placed on actual notice of the lawsuit when

the summons and complaint were served on January 7, 2003.  See Lifestar, 908 So.2d

---

[21] The court notes that the fact that the evidence was not presented during the course of
the Lemuel proceedings does not negate the fact that the evidence *could have been*
presented and, thus, does not preclude the application of *res judicata*.  Despite Lifestar's
assertions to the contrary (see, e.g., Doc. No. 47 at 16), the court finds that Lifestar had a
full and fair opportunity in state court to advance its position as to its alleged lack of
notice and absence of culpability.  At the hearing on the motion to set aside the default
judgment, Lifestar was represented by counsel, participated in the hearing, made
arguments and presented evidence.  Lifestar raised issues surrounding its receipt of notice
of the Lemuel lawsuit and its culpability in the prior litigation; it, thus, had "a fair
opportunity procedurally, substantively and evidentially" to contest and oppose the circuit
court's reasons for entering the default judgment. Cf. *In re* Bush, 62 F.3d 1319, 1323
(11th Cir. 1995) (the "actually litigated" element of collateral estoppel "does not refer to
the quality or quantity of argument or evidence addressed to an issue"); see also Cashion
v. Torbert, 881 So.2d 408, 418 (Ala. 2003) (discussing "same issue" element of *res
judicata* and explaining that the appropriate inquiry "would not be limited to a
determination of what issues had actually been litigated, but rather would include
consideration of what issues could have been litigated").

at 214 & 224.  It concluded that Lifestar deliberately failed to acknowledge what was readily apparent on January 7, 2003, i.e., that it was the defendant being sued by Lemuel.[22]

In sum, the court declines Lifestar's invitation to revisit the findings of the state court surrounding the date Lifestar received actual notice of the Lemuel litigation.  Based on the fulfillment of the four elements of *res judicata*, the court finds that the issue of when Lifestar received actual notice of the lawsuit has been decided and that the finality of the state court judgment cannot be undermined by relitigating the matter in this court. Thus, for purposes of the court's analysis herein, the date Lifestar received actual notice of the Lemuel complaint is January 7, 2003.

## C.  The Merits

### 1.  The Admiral Policy

Admiral contends that Lifestar violated the conditions of the Admiral policy which required that, "as a condition precedent" to coverage, Lifestar must notify Admiral "as soon as practicable" of the filing of any suit or claim against it and must forward "immediately" suit papers.  (Doc. No. 26 at 12-26; Admiral Policy at 5, Ex. A to Doc.

---

[22] Incidentally, not only did the state court find that service of process provided actual notice to Lifestar, but it also concluded that Lifestar received actual notice of litigation when it was served with the circuit court's May 16 order setting a hearing in the Lemuel lawsuit on damages regarding Lemuel's application for default; yet again, Lifestar did not appear at that hearing.  See Lifestar, 908 So.2d at 214, 216-17, 224.

No. 46.)  Lifestar received actual notice of the pendency of the Lemuel litigation on

January 7, 2003.  Yet, Lifestar did not notify Admiral of the Lemuel suit or claim until

June 3, 2003, some five months after it received notice and approximately two weeks

after the circuit court entered the default judgment.

Admiral contends that the five-month delay does not satisfy Lifestar's contractual

obligations to notify it "as soon as practicable" and to forward suit papers "immediately."

It argues that Lifestar has not offered a valid excuse for the delay and that, therefore, the

untimely notice is unreasonable as a matter of law.

As stated, under both Alabama and New York law, an insured's failure to provide

notice "as soon as practicable" or "immediately" is a complete defense to coverage.  See,

e.g., Pharr, 429 So.2d at 1019.  Both terms require the insured to provide notice "within a

reasonable time in view of the facts and circumstances of the case."  Pharr, 429 So. 2d

at 1019.  The length of the delay and the reason for the delay are the only two factors

which the court examines to resolve the "reasonableness" inquiry.  See Argo, 827 N.E.2d

at 764-65; Blank, 27 F.3d at 795; Thomas, 334 So.2d at 883-85.  Because the facts are

not in dispute surrounding the date Lifestar had actual notice of the Lemuel litigation

(*albeit* by virtue of the application of *res judicata*), summary judgment will be

appropriate if Admiral can demonstrate that the delay in notification was unreasonable as

a matter of law.  See Olin Corp. v. Ins. Co. of North Am., 743 F. Supp. 1044, 1053

(S.D.N.Y. 1990), aff'd, 929 F.2d 62 (2d Cir. 1991) ("While the reasonableness of delay

may be an issue for trial, in the absence of an excuse or mitigating factors, courts have addressed that question as a legal matter.").

First, the court finds that Lifestar did not provide timely notice.  Similar delays have been deemed untimely by both Alabama and New York courts where the policies require notice to be given "as soon as practicable" or "immediately."  Compare Pharr, 429 So.2d at 1018-20 (eight months; Alabama law), and B & M Homes, Inc. 356 So.2d at 1195 (seven months; Alabama law), and Thomas, 334 So.2d at 883-85 (six months; Alabama law), with Utica Mut. Ins. Co. v. Fireman's Fund Ins., 748 F.2d 118, 121 (2d Cir. 1984) (six months; New York law), and Peerless Ins. Co. v. Nationwide Ins. Co., 208 N.Y.S.2d 469, 470-71 (N.Y. App. Div. 1960) (four to five months; New York law). Indeed, New York courts have deemed delays in notification as short as two months and less to be untimely.[23]  American Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1993) (36 days) (collecting cases); Olin, 743 F. Supp. at 1053 (citing Westinghouse, infra, and Elman, infra); Deso v. London & Lancashire Indem. Co., 143 N.E.2d 889, 891 (N.Y. 1957) (51 days); Power Auth. of the State of New York v. Westinghouse Electric Corp. ("Westinghouse"), 502 N.Y.S.2d 420, 423 (N.Y. App. Div. 1986) (53 days; notice of occurrence); cf. Government Employers Ins. Co. v. Elman

---

[23] Some of the opinions cited pertain to an insured's untimely compliance with a notice-of-occurrence provision.  Given that the interests of an insurer in receiving prompt notification of an occurrence and a claim are largely indistinguishable, see AXA Marine and Aviation, 84 F.3d at 626-27, the court can envision no reason why these opinions should not apply with equal force when determining whether an insured's notice of a claim or suit is untimely.

("Elman"), 338 N.Y.S.2d 666, 667 (N.Y. App. Div. 1972) (29-day delay was untimely in light of policy requirement that notice be given "as soon as reasonably possible").

Here, Lifestar had knowledge of the pendency of the Lemuel lawsuit for more than five months, yet during that time frame there was a complete lack of notice by Admiral. Based on the foregoing authority, the court finds that Lifestar's five-month delay of notice is untimely in light of the express policy language requiring that notice be provided "as soon as practicable" and "immediately."

Second, the only reason offered for the delay is the contention that Lifestar lacked actual knowledge of the Lemuel lawsuit until June 3, 2003, when a news reporter called seeking a comment by Lifestar as to the $5,000,000 default judgment.  However, Lifestar's assertion that it was unaware of the Lemuel lawsuit until June 3, 2003, cannot justify the delay because, as discussed in the preceding section, the principle of *res judicata* precludes relitigation of that issue.  Indeed, Lifestar's argument unequivocally was rejected by both the Supreme Court of Alabama and the circuit court.  Because Lifestar offers no other explanation for its delay or an extenuating circumstance to justify the delay, and no other reason is presented elsewhere in the record, the court agrees with Admiral that the delay in notifying Admiral of the lawsuit is unexcused.  The court, thus, is presented with undisputed facts of an untimely and unexcused delay.

Lifestar argues, alternatively, that its late notice should be forgiven because Admiral had ample opportunity to control the litigation even on June 3, 2003.  Lifestar, for instance, contends that Admiral could have filed a timely motion to set aside the

default judgment.  (Doc. No. 47 at 15.)  For at least two reasons, the court disagrees with Lifestar's argument.

First, Lifestar's argument does not constitute a reason for why Lifestar failed to provide notice to Admiral for more than five months, but rather bears on whether or not Admiral suffered prejudice as result of the late notification.  When the delay is untimely and unexcused, as here, the inquiry is over.  The presence or absence of prejudice is irrelevant to the determination of whether a policy between an insured and its primary carrier is vitiated.  See Argo, 827 N.E.2d at 765; Thomas, 334 So.2d at 883.

Second, notwithstanding the irrelevance of prejudice, the court finds that there is ample, undisputed evidence to support a finding that Admiral was prejudiced by the late notice.  Contrary to Lifestar's assertion, the insurer's interest in receiving notice is not whether at some point in time during the lawsuit the insurer can gain control of the litigation.  Rather, prompt notice is required so that the insurer can gain "*early* control over litigation."  AXA Marine and Aviation, 84 F.3d at 626 (emphasis added).  The purpose of an insurance policy condition that the insured provide prompt notice of the commencement of a lawsuit against it is "to provide the insured with a fair and reasonable opportunity to appear and defend against a claim or exercise its right to settle the matter." American Transit Inc. Co. v. Sartor, 781 N.Y.S.2d 630, 632 (N.Y. 2004).

The court finds that Admiral's ability to defend the claims on the merits was appreciably diminished by the delay, thus, denying it a "fair and reasonable opportunity" to appear and defend.  By the time Admiral received notice, a determination of liability

had been made against its insured, as a default judgment, not merely an entry of default, had been entered.  The fact that the time had not expired to move to set aside the default judgment offers little consolation.  In June 2003, the proceedings having moved forward for more than five months with no appearance by Lifestar, Admiral faced an uphill battle; the default judgment effectively had transferred the burden of proof from Lemuel to prove liability to Lifestar, not only to disprove its culpability, but also to demonstrate the existence of a meritorious defense.[24]

Admiral also lost the opportunity to pursue an early settlement.  As observed by the court in AXA Marine and Aviation, that loss is substantial:

> The value to an insurance company of the opportunity to settle a claim early should not be underestimated.  Early settlements limit the company's exposure and may protect the insured from a judgment in excess of the policy coverage.  When notice of claim is delayed, the ability of the insurance company to approach the injured party with a settlement offer early in the litigation is often lost.
>
> . . .

---

[24] The fact that Admiral was not given notice of the Lemuel lawsuit until *after the entry of the default judgment* further amplifies the untimeliness and prejudicial effect of the late notice.  See, e.g., Webb, 200 F.3d at 759 (holding that, notwithstanding that insurer had notice of a pre-suit claim, the insurer was not required to pay a default judgment entered against its insured where, contrary to a policy provision, the insured failed to forward suit papers or give the insurer actual notice of the lawsuit prior to entry of the default judgment); Safeway Ins. Co., 748 So.2d at 221 (holding that insurer was not obligated to provide coverage for default judgment entered against its insured because it was not given notice of the suit until after the judgment was entered); Watts, 423 So.2d at 173 (holding that summary judgment appropriately was entered for insurer where insured failed to forward suit papers to insured prior to entry of default judgment); Argo, 4 N.E.2d at 764-65 (insured against whom default judgment had been entered acted unreasonably as a matter of law, when it did not notify insured of lawsuit until six months after default judgment had been entered).

> An early settlement can cap liability as to those injuries or damages that the parties were aware of at the time of settlement and the results of those injuries or damages.

84 F.3d at 627.

In sum, the court finds that Lifestar's untimely and unexcused delay of five months breached the condition of the Admiral policy that Lifestar give notice to Admiral of the Lemuel lawsuit "as soon as practicable" and that it "immediately" forward any suit papers.  Because the court finds that there are no issues of material fact in dispute, the court finds that the unexcused delay is unreasonable as matter of law.  Accordingly, the court finds that Admiral is not obligated to provide coverage for any portion of the $5,000,000 default judgment in the Lemuel litigation and that, therefore, it is entitled to the entry of summary judgment in its favor.

### 2.  The Markel Policy

Markel's basis for disclaiming coverage is based upon paragraph E of Section V of the policy conditions which outlined the policy's notice provisions concerning coverage for claims and suits.  (Doc. No. 76 at 13.)  In particular, Markel relies upon the policy provision in Section V.E.1.b., which provided that Lifestar "must see to it that [Markel] or [its] authorized representative and [Lifestar's] underlying insurers . . .  receive notice of the 'claim' or 'suit' as soon as possible."  (Policy at 15-16 (Ex. 5 to Doc. No. 75).)  Markel also asserts that Lifestar violated the condition in Section V which set forth that Lifestar

must "immediately send [Markel] copies of any demands, notices, summonses, or legal papers received in connection with a 'claim' or 'suit.'"[25]  (Id.)

As stated, Lifestar received notice of the Lemuel claim and lawsuit on January 7, 2003, as found by the state court.  Markel, however, did not receive notice of the Lemuel lawsuit until sixteen months later on May 12, 2004.[26]  Markel points out that it received notice almost a year after Admiral received notice, eight months after Lifestar filed an appeal with the Supreme Court of Alabama, and nearly three months after the Supreme Court of Alabama took the appeal under submission upon filing of all briefs by Lifestar and Lemuel.  (Doc. No. 76 at 7-8 (¶¶ 14-15), 12.)  Furthermore, Markel argues that the unreasonableness of Lifestar's delay is amplified by the fact that Lifestar, a "sophisticated" insured, undisputely knew on June 3, 2003, that the $5,000,000 default judgment exceeded its policy limit under the Admiral policy.  Yet, Lifestar failed to provide notice to Markel at that time and further failed to provide notice even after receiving a letter from Admiral on June 19, 2003, advising Lifestar to promptly notify any excess carriers of the claim.  (Doc. No. 76 at 16.)  Markel asserts that the foregoing represents ample undisputed facts to support a finding that the Lifestar's sixteen-month

---

[25] Markel does not invoke the condition which requires notice "as soon as possible of any 'occurrence' which may result in a 'claim' involving this insurance or any 'underlying insurance.'"  (Markel Policy (Ex. to Doc. No. 75.)

[26] Markel received notice on May 12, 2004, not from Lifestar, but rather from Admiral. For purposes of resolving the coverage question at issue, the court deems May 12, 2004, to be the date under the Markel policy upon which notice was accomplished.

58

delay in providing notice was untimely and in breach of the foregoing policy provisions. The court agrees.

Initially, the court considers whether the length of the delay is untimely and, if so, whether Lifestar has presented a valid reasons for the delay.  If the answer to these questions indicates that the delay was unreasonable, the court also must consider the issue of prejudice, as under Alabama and New Jersey laws an unreasonable delay in providing notice to an excess carrier, such as Markel, does not forfeit coverage unless it can establish that it was prejudiced by the delay.

Clearly, if a five-month delay is untimely, as in the case of Lifestar's delay of notice to Admiral, a fourteen-month delay is unseasonable.  The untimeliness of the notice similarly is undisputedly established by virtue of the fact a default judgment had been entered against Lifestar and the circuit proceedings had concluded.  Second, the court finds that Lifestar has not presented any valid reason, and none is contained in the record, which excuses the failure of Lifestar to notify Markel.  Only one reason has been advanced to justify the delay, and the court already has rejected that reason.  As discussed previously in this opinion, Lifestar, joined in argument by Lemuel, has attempted to transfer the burden of notification from Lifestar to Admiral.  Lifestar argues that the fact that Markel did not receive notice of the claim until May 12, 2004, cannot be attributed to any fault of Lifestar because under New Jersey law Lifestar had no obligation to provide any notice.  (Doc. No. 103 at 7-8.)  However, as discussed *supra*, the court finds that

Lifestar is not absolved of its contractual notification duties set out in the Markel policy, as its reliance upon American Centennial, *supra*, to support its position is misplaced.

Alabama and New Jersey, as stated, require that an excess insurer must demonstrate that it was prejudiced as a result of the delay in notification before it can deny coverage. See Midwest Employers Cas. Co., 695 So.2d at 1173 (under Alabama law "excess insurer is required to show prejudice when it bases its denial of a claim . . . on an alleged failure to comply with notice provisions of the policy"); Morales v. National Grange Mut. Ins. Co., 423 A.2d 325 (Law Div. 1980) (under New Jersey law, excess insurer must show "appreciable prejudice").

In Morales, cited by Lemuel, a New Jersey superior court reiterated that in order for an insurer to avoid coverage for lack of notice, "there must be proof that the notice provision of its policy was breached, and that it was appreciably prejudiced thereby." Id. at 327 (citing Cooper v. GEICO Ins. Co., 237 A.2d 870 (1968)). The court identified two factors relevant to the "appreciable prejudice" inquiry. Id. at 329-30.

The first is "whether substantial rights have been irretrievably lost by virtue of the failure of the insured to notify the carrier in a timely fashion." Id. at 329. The second factor requires the insurer to show that "it would have had a meritorious defense had it been informed of the accident in a timely fashion." Id. at 330; see also Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 561 (3rd Cir. 2001) (applying New Jersey's appreciable prejudice doctrine).

60

Markel asserts that it was denied the opportunity to investigate the Lemuel claim, to determine its rights and liabilities under the Markel policy, to communicate with Admiral concerning the defense of Lifestar, and to investigate, negotiate and participate in a possible settlement of the claim. (Doc. No. 76 at 10; Petzold Aff. at 2 (Ex. 4 to Doc. No. 75).) Markel also argues that it was denied the opportunity to participate in the decisions made by Lifestar, its attorneys, and Admiral concerning the strategy and efforts to have the default judgment set aside and to oppose Lemuel's motion to amend the default judgment. (Id.) Markel asserts, in essence, that these deprivations caused a loss of its substantive rights under its policy.

Lifestar and Lemuel, however, contend that Markel was not prejudiced by the "alleged late notice" because Markel had no duty to defend under the policy; thus, suggesting that it cannot be said that Markel lost any "substantial rights." (Doc. No. 101 at 17; Doc. No. 103 at 10).) For the reasons to follow, the court agrees with Markel.

Initially, the court observes that Lifestar and Lemuel are correct that the Markel policy provides that Markel had "no duty to defend" when the occurrence was covered under "underlying insurance." (Markel Policy at 9 (Sec. II.A.2).) They, however, have omitted mention of the second sentence of that section which provides that, notwithstanding the absence of a duty to defend, Markel "shall have the right to associate with the insured in the defense and control of any 'claim' or 'suit' that [it] think[s] may involve this policy." (Id.)

61

The denial of an excess insurer's contractual option to participate in the defense of the insured has been deemed prejudicial by more than one court.  In <u>Allstate Ins. Co. v. Kepchar</u>, the court held that the excess insurer suffered prejudice as a matter of law when it was not notified of the lawsuit until more than a year after the trial.  <u>See</u> 592 N.E.2d 694 (Ind. Ct. App. 1992).  The court observed that the excess insurer was denied the "opportunity to associate with the defense and control of the case, attempt to negotiate a settlement in cooperation with the underlying insurer, or take an appeal."  <u>Id.</u> at 699. "[T]he mere fact that the delay in notice precluded [the insurer] from exercising nearly every right reserved under the policy is itself enough to justify a finding of prejudice as a matter of law."  <u>Id.</u>; <u>see also</u> <u>Prince George's County v. Local Gov't Ins. Trust</u>, 879 A.2d 81, 194 (Md. 2005) (collecting cases).

Markel, as an excess carrier, had a contractual right to participate in the underlying proceedings.  Yet, Markel irretrievably lost that right by the time it received notice of the Lemuel litigation in May 2004.  By that point, the circuit court proceedings had concluded in a $5,000,000 default judgment against Lifestar, and the appeal proceedings were almost complete.  Markel had forever lost its right to oppose the merits of Lemuel's causes of action, to defend its insured, to prevent the default judgment and to pursue the viability of settlement.  The delay did not merely frustrate Markel's contractual right, but it extinguished that right.  The court finds that the wholesale denial of its contractual right resulted in prejudice to Markel.

Based on the foregoing, the court is unpersuaded by Lemuel's and Lifestar's reliance on the absence of contractual language imposing on Markel a duty to defend. Similarly, the court rejects Lemuel's and Lifestar's contention that "[a] question of fact exists as to whether even if Markel had notice, it would have done anything different." (Doc. No. 101 at 17-18; Doc. No. 103 at 10.)  The argument is unsupported and speculative at best and, thus, is insufficient to raise a triable issue of material fact.  See Woods v. Paradis, 380 F. Supp. 2d 1316, 1330 (S.D. Fla. 2005) ("Plaintiff cannot defeat Defendants' motion for summary judgment with speculative assertions unsupported by any record evidence.").

Turning to the second Morales factor, ironically, it is Lifestar which has presented evidence indicating the plausibility of a meritorious defense.  Lifestar has presented more than one reason why it believes that the state court erred in its findings, and some of these reasons have been relied upon by Markel to support its position that it suffered prejudice by being deprived the opportunity to participate in the defense.  (See Doc. No. 104 at 7.) First, Lifestar has presented evidence, through its regional manager, of the applicability of a Montgomery City Ordinance, Ordinance 25-98, in light of Lifestar's post-judgment assessment that the Montgomery Fire Department's medical professionals were first on the scene and were in charge.  (See Doc. Nos. 105, 110; Bryan Dep. at 80-87; Doc. No. 47 at 18-19.)  This evidentiary argument is a compelling one in favor of Lifestar on the issue of whether the presence and involvement of the Montgomery Fire Department absolves Lifestar of liability on the merits of Lemuel's wrongful death claim.  See

Lifestar, 908 So.2d at 219-222 (discussing the absence of adequate argument/evidence as to the application of the ordinance).  Second, as to the propriety of the entry of the default judgment, Lifestar has insisted that during these proceedings service of process on Lifestar on January 7, 2003, was improper and has submitted evidence which it contends supports its position.  (See, e.g., Doc. No. 110.)

Third, Lifestar has presented an argument which bears directly on whether Lifestar's liability would exceed Admiral's primary policy limit.  Lifestar argues that the imposition of a $5,000,000 punitive damages award was excessive and contends that, if its counsel had requested a hearing pursuant to Hammond City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), the punitive damages award, at the very least, would have been subject to reduction.  See Lifestar, 908 So.2d at 225-26 (declining to review the punitive-damages award because the issue of its excessiveness was not properly raised during the state court proceedings).

Accordingly, based on the foregoing, the court finds that the facts are sufficiently developed to establish that, pursuant to New Jersey law, Markel has met its burden showing prejudice as a matter of law.  The result is the same under Alabama law which also requires a finding of prejudice.  See Midwest Employers Cas. Co., 695 So.2d at 1173 Finally, under New York law, where prejudice to the insurer is not a prerequisite, Lifestar's untimely and unexcused notice is sufficient in and of itself to preclude coverage under the Markel policy.  See Am. Home Assur. Co., 90 N.Y.2d 433, 437-38 (no-prejudice rule applies to excess insurer).

In sum, the Markel policy unambiguously required Lifestar to give notice of the Lemuel claim and suit "as soon as possible" and to "immediately" forward suit papers. Based upon the undisputed evidence, the court finds that Lifestar had actual notice of the Lemuel lawsuit on January 7, 2003, upon receipt of the summons and complaint, and that Markel's receipt of notice some sixteen months later on May 12, 2004, was a breach of Markel's notice provision. Furthermore, the court finds that Lifestar has presented no valid justification for the delay and that Markel has demonstrated that it was prejudiced by the unexcused delay. The court, thus, finds that Lifestar's failure to give timely notice results in a loss of benefits under the Markel policy. Accordingly, the court finds that Markel's motion for summary judgment is due to be granted.[27]

## VI.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Admiral's motion for summary judgment (Doc. No. 26) be and the same is hereby GRANTED and that it is hereby DECLARED and ADJUDGED that there is no coverage under the Admiral policy for the default judgment entered in the Lemuel lawsuit and that Admiral, therefore, had no duty to defend Lifestar nor is it obligated to indemnify Lifestar or any party for the default judgment obtained by Lemuel in the state court action.

---

[27] Given the findings herein, the court pretermits discussion of Markel's alternative argument that its policy excludes coverage for punitive damages awards.

65

It is further CONSIDERED and ORDERED that Markel's motion for summary judgment (Doc. No. 46) be and the same is hereby GRANTED and that it is hereby DECLARED and ADJUDGED that there is no coverage under the Markel policy for the default judgment entered in the Lemuel lawsuit and that Markel, therefore, is not obligated to indemnify any party or entity for the default judgment obtained by Lemuel in the state court action.

It is further CONSIDERED and ORDERED that Lemuel's counter-motion for summary judgment (Doc. No. 75) be and the same is hereby DENIED.

Done this 23rd day of January, 2006.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE